# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **BRIAN HURST,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **NO. 3:17-cv-00661** |
| | ) | **CHIEF JUDGE CRENSHAW** |
| **JAMES HOLLOWAY, Warden,** | ) | |
| | ) | |
| **Respondent.** | ) | |

## <u>MEMORANDUM OPINION</u>

The *pro se* Petitioner is a state inmate serving a life sentence for first-degree murder. (Doc. No. 14-1 at 38.) He seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254. (Doc. No. 1.) The Court will deny his petition for the reasons set forth below.

## I. BACKGROUND AND PROCEDURAL HISTORY

A Davidson County jury found Petitioner guilty of first-degree murder on June 10, 2010. (Doc. No. 14-1 at 37.) The trial court sentenced him to life in prison with the possibility of parole. (<u>Id.</u> at 38.) The Tennessee Court of Criminal Appeals affirmed the judgment on direct appeal, and the Tennessee Supreme Court denied Petitioner's application for discretionary review on May 9, 2013. (Doc. Nos. 14-15, 14-17.)

On September 1 2013, Petitioner filed a *pro se* petition for state post-conviction relief. (Doc. No. 14-18 at 44.) The post-conviction court appointed counsel (<u>id.</u> at 56), who filed an amended petition on July 21, 2014. (<u>Id.</u> at 78.) The court held a hearing on August 1 and September 4, 2014. (<u>Id.</u> at 95–96.) After the hearing, Petitioner was permitted to submit a post-hearing brief to assert additional grounds for relief based on the evidence presented at the hearing. (<u>Id.</u> at 97.) The post-conviction court denied relief on October 13, 2014. (<u>Id.</u> at 102–13.) The Tennessee Court

of Criminal Appeals affirmed, and the Tennessee Supreme Court denied discretionary review on May 5, 2016. (Doc. Nos. 14-25, 14-28.)

Petitioner now seeks a federal writ of habeas corpus pursuant to 28 U.S.C. § 2254, and Respondent acknowledges that his petition is timely. (Doc. No. 15 at 3.)

## II.    STATEMENT OF FACTS

To recap the Tennessee Court of Criminal Appeals' lengthy summary of the evidence, in the spring and early summer of 2008, Petitioner, his long-time on-again-off-again girlfriend—Jessica Scott—and the victim were involved in a love triangle. (Doc. No. 14-15 at 4–21.) Petitioner had moved out of Scott's house, but they continued to see each other and sleep together for some period of time.  In May 2008, Scott began dating the victim.  Scott testified that she informed Petitioner on May 11, the day after her first date with the victim, that she intended "to pursue something" with the victim, and that Petitioner told her that he was not going to lose her. (Id. at 4, 8.)  Scott said her relationship with Petitioner ended that day, and that she only had sex with him once more after that date. (Id. at 4, 8.)  Petitioner testified that Scott told him on May 10, 2008, that they should see other people, but that she denied having any romantic interest in anyone else. (Id. at 16.)  He testified that he did not learn that Scott and the victim were romantically involved until just before Memorial Day weekend when he saw them together. (Id. at 17.)  He said that after their May 10 conversation about seeing other people, they continued to see each other just as often as before, and that she would come home and climb into bed with him even after the first week in June when she was pretty regularly staying at the victim's house until early morning. (Id. at 16–18.)  Petitioner and Scott both testified to the effect that they attended church together up until the victim's death, and that Petitioner had continued to do household chores in and around her house, at her invitation. (Id. at 8, 16, 19.)

Petitioner testified that from the time in May when he began to suspect that Scott was seeing someone, he grew "100 percent totally consumed" with the issue, started having difficulty sleeping, and lost forty pounds in three weeks. (Doc. No. 14-15 at 16.)  He testified that once he confirmed—and Scott subsequently admitted—that Scott and the victim were involved, he was devastated and "consumed with anger and rage and jealousy." (<u>Id.</u> at 17.)  He testified that he was confused by Scott's treatment of him, and that he became suicidal and researched on the internet ways to kill himself. (<u>Id.</u> at 17–18.)  A friend of Petitioner's testified that Petitioner lost a significant amount of weight and often missed work during that period. (<u>Id.</u> at 14.)  Scott testified that Petitioner's behavior during that time was strange for him and seemed particularly desperate. (<u>Id.</u> at 8.)

Petitioner also began dreaming about violence toward the victim, and told at least two friends that he was dreaming or thinking about killing the victim. (<u>Id.</u> at 13–14, 18.)  On June 4 or 5, 2018, Petitioner sat in his Jeep outside the victim's apartment waiting to confront him, until Carter Wamp, the property manager, told him to leave after Petitioner lied to Wamp about his reason for being there. (<u>Id.</u> at 12, 18.)  Petitioner admitted at trial that he was thinking about killing the victim that day. (<u>Id.</u> at 20.)  He intended to stab the victim with two different knives and take his wallet in a staged robbery, and had several items with him to carry out that plan. (<u>Id.</u>)  On June 5, 2018, Petitioner checked himself into the hospital because of his suicidal and homicidal thoughts and was later voluntarily assessed by mental health crisis counselor Julia Neilan, who contacted the victim to warn him about his safety. (<u>Id.</u> at 13–14, 18.)  Scott visited Petitioner at the hospital and returned later to give him a ride to his mother's house. (<u>Id.</u> at 5–6, 18.)  Petitioner told Scott that he was seeking help because he was having thoughts about killing the victim, but she believed his statements were designed to win her back, and she did not warn the victim about Petitioner's

statements. (Id. at 5.)

Petitioner and Scott both testified that they engaged in two emotional conversations on June 22, 2018:

> Ms. Scott testified that on the morning of June 22, 2008, she returned home around 11:30 a.m. after spending the night with the victim. She walked in her door and discovered the defendant standing at the bottom of her stairs. She testified that the defendant was very emotional, and he begged her to talk with him and to quit talking to the victim. The witness testified that the defendant told her that the victim was getting in the way and that if she would just quit talking to the victim, they would be able to "work this out." She testified that she told the defendant that the victim was not "in the way" and that she was pursuing the victim. She testified that she told the defendant that she did not have time for further discussion because she had to go to work, and she stepped into the shower hoping that the defendant would leave. The defendant agreed to leave if she would talk with him one more time. She agreed.

> Ms. Scott testified that she saw the defendant again that day sometime after 4:30 p.m. The defendant arrived at her house bearing "letters that he had written to me" and "a bunch of old pictures of us together." She testified that she allowed the defendant to show her the pictures and to read to her from these materials. When he was finished, she told him "it doesn't matter" and that she no longer wanted to have anything to do with him. She testified that the defendant became extremely upset. She testified that she picked up all of the materials that he had brought with him and threw them into the vehicle that he was driving. The defendant left but returned a short time later to discover her crying. They went back outside again and continued their discussion to the point that it attracted the attention of the neighbors. The defendant finally left a second time.

> Ms. Scott testified that as result of the day's events, she decided to change her alarm code. She called the defendant later that day and informed him that if he returned to her residence, the police would arrest him and that she would not intervene. She testified that the defendant asked her if she was telling him that she wanted him completely out of her life, but she told the defendant that she did not. She told the defendant that they would still see each other on occasion, but that she was moving on. She testified that the defendant was very upset.

(Doc. No. 14-15 at 6.) Petitioner's version was that

> he went over to Ms. Scott's house because they had agreed to go to church together. He testified that Ms. Scott was not there when he arrived, so he waited. When she finally returned, they had an emotional conversation, during which Ms. Scott was crying and kissing him. He testified that during their conversation Ms. Scott told him that she could not stop seeing the victim because the victim had been "nothing but nice" to her, and she did not know how she could possibly explain to the victim why she wanted to be with the defendant. The defendant testified that he finally left

> when Ms. Scott told him that she had to go work. He testified that when he returned home, he wrote out a draft letter to demonstrate to Ms. Scott how she could let the victim down without "seeming like a jerk."
>
> The defendant testified that he saw Ms. Scott later that evening and that they discussed their relationship further. At one point, Ms. Scott became angry and asked him to leave. The defendant decided that he needed proof that the victim was "not the person that she thought that he was."

(Doc No. 14-15 at 19.)  Scott testified that Petitioner was crying and upset, very emotional and "acting pretty desperate" that day, but that he had been jealous throughout their relationship, and that he had admitted to going through her phone to learn about an outing she had with the victim. (Id.)

Petitioner testified that he drove his mother's car, which he had been driving off and on for about two weeks because it needed maintenance, to the victim's apartment early the next morning, June 23, 2008, to "see what [he] could find out" about the victim's involvement with another woman with whom Petitioner had seen the victim before. (Doc. No. 14-7 at 104–106; Doc. No. 14-15 at 19, 21.)  Petitioner said he saw the victim leave his apartment hugging and kissing the other woman.  He said that after the woman left, the victim approached Petitioner near the victim's truck, where Petitioner hoped to find evidence of the woman's identity. (Doc. No. 14-15 at 19.) Petitioner testified that when the victim told Petitioner that Scott would not believe him about the other woman, Petitioner pretended to have evidence of the two of them together on his cellphone. (Id.)  According to Petitioner, the victim then lunged at him and put him in a chokehold, trying to take Petitioner's phone. (Id.)  Petitioner put the phone in his pocket, where he was also carrying his gun, and as the men struggled, the victim reached into Petitioner's pocket and pulled out the gun instead of the phone. (Id.)  Petitioner testified that the gun went off next to his head, and went off a second time as the struggle continued. (Id.)  He described what he said happened next:

> The defendant testified that he turned around and discovered the victim pointing the gun at him. The defendant testified that he begged the victim not to shoot him, but the victim responded "You f'ing killed me." The defendant testified that he ran

away, and the victim followed him. The defendant testified that he hid behind a porch at the back of the apartment building as the victim chased him and then lunged out at the victim as he passed. The defendant testified that the two of them wrestled around in a circle for control of the gun. Finally, he bit the victim, and the victim let go of the gun. The defendant testified that he told the victim to let go of him, but the victim refused. The defendant testified that he fired two or three shots and then ran away without checking on the victim. The defendant testified that he never intended to kill the victim because he knew that there was no way he could do so and still get Ms. Scott back.

(Doc. No. 14-15 at 20.) Petitioner testified that he was afraid he would be arrested, so he threw the gun out his car window while he was driving across a bridge. (Id.) He testified that he later threw away the bloody shirt he had been wearing in a trash can at a gas station. (Doc. No. 14-7 at 215.) Petitioner testified that he took several Tylenol PM pills on the way to and at his mother's house because he did not want to live. (Doc. No. 14-15 at 20.)

A woman in the victim's apartment complex testified that she heard around 30 seconds of arguing in the parking lot shortly before 5 a.m. on June 23, followed by one or two gunshots at 5:03 and three or four more at 5:07. (Doc. No. 14-15 at 10.) She did not notice anyone running away or any car speeding away. (Id.) The victim's body was found around 6 a.m. behind his apartment building, at the end of a trail of blood leading from the area of the victim's truck in the parking lot in front of the building, with multiple injuries including "a devastating gunshot wound to the head." (Id. at 2.) Specifically, he had a bite mark on his forearm, fresh abrasions on his knees, and four gunshot wounds to his head and neck: one to the left back of his head, which traveled through his brain and out his cheek, which would have rendered the victim unconscious and would have been fatal by itself, and appeared to have been inflicted where the body was found; one to the back left side of the neck, which would have been painful but not fatal, and which was likely fired from fairly close range, possibly in the parking lot; one from extremely close range to the right jaw while the victim was standing, which would have caused extensive bleeding and

likely created the blood trail leading from the parking lot to the location of the body; and a grazing wound to the right side of the neck, which was fired from some distance either in the parking lot or anywhere along the blood trail and would not have immobilized the victim. (Doc. No. 14-15 at 2, 10–11.)

The law enforcement investigation began to focus on Petitioner after interviews with several people, including Scott, but authorities had difficulty locating Petitioner that morning. (Doc. No. 14-15 at 2.)  Later that day, Scott called Petitioner after being informed that he would not reveal his location until he spoke with her. (Id. at 7.)  Petitioner told Scott that he had not shot the victim, but he had heard about the victim's death on the radio and was afraid the police were coming to get him. (Id.)  A police officer ultimately found Petitioner on the porch of his mother's house, where emergency service personnel were treating him. (Id. at 2–3.)  Petitioner was taken into custody for an emergency psychological evaluation and later processed and booked. (Id. at 3.)

Investigation revealed that Petitioner was a minor contributor of DNA found in the victim's bite wound. (Id. at 12.)  Forensic analysis of a computer shared by Petitioner and Scott revealed a keystroke recorder that was in the recycle bin but still active, as well as searches under the "Brian" user name about the victim and Scott's mutual employer, guns, poisons, cyanide poisoning, rattlesnakes for sale, queries about what happens if air is injected into a person's veins, and mapquest directions to Mount Juliet, Tennessee, where the victim worked. (Id. at 9, 14.) Investigators also found a letter, written in Petitioner's handwriting but as if it were written by Scott to the victim, explaining that Scott still loved Petitioner and was going to give him another chance and did not expect the victim to wait for her. (Id. at 7.)  Petitioner testified that he wrote the letter the day before the shooting to show Scott how she could break up with the victim "politely." (Doc. No. 14-7 at 99–100.)

## III. ISSUES PRESENTED FOR REVIEW

The petition asserts nine claims for relief:[1]

1. There was insufficient evidence to support the convictions. (Doc. No. 1 at 8.)

2. The trial court violated Petitioner's right to due process by permitting a <u>Jencks</u> violation at trial. (<u>Id.</u> at 9.)

3. The state court erred by finding that there was insufficient evidence to support Petitioner's self-defense claim. (<u>Id.</u> at 11.)

4. The trial court violated Petitioner's right to due process by instructing the jury that it could infer guilt from the destruction of evidence. (<u>Id.</u> at 12.)

5. Petitioner received ineffective assistance of counsel at trial. (<u>Id.</u> at 14.)

6. The state committed prosecutorial misconduct at trial. (<u>Id.</u>)

7. Post-conviction counsel was ineffective for failing to raise several claims of ineffective assistance of trial counsel, prosecutorial misconduct, and juror misconduct, and for failing to call witnesses to support his ineffective assistance claim. (<u>Id.</u>)

## IV. STANDARD OF REVIEW

The statutory authority of federal courts to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). A federal court may grant habeas relief to a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Upon finding a constitutional error on habeas corpus review, a federal court may only grant relief if it finds that the error "had substantial and injurious effect or influence in determining the jury's verdict." <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 637 (1993); <u>Peterson v. Warren</u>, 311 F. App'x 798, 803–04 (6th Cir. 2009).

---

[1] The Court observes that Petitioner frequently includes information extraneous to his specific claims "only as a supplement to support" his claims. (See Doc. No. 1 at 36, 38, 43, 44, 46, 52, 61, 66, 75, 79, 82, 94, 96, 97, 126.) Except to the extent that it pertains directly to Petitioner's claims and was relied on in support of his claims in state court, this Court has not considered such "supplements." <u>See</u> <u>Cullen v. Pinholster</u>, 563 U.S. 170, 181 (2011) (holding that habeas review is limited to the evidence that was presented in state court).

AEDPA was enacted "to reduce delays in the execution of state and federal criminal sentences, particularly in capital cases . . . and 'to further the principles of comity, finality, and federalism.'" Woodford v. Garceau, 538 U.S. 202, 206 (2003) (quoting Williams v. Taylor, 529 U.S. 362, 436 (2000)). AEDPA's requirements "create an independent, high standard to be met before a federal court may issue a writ of habeas corpus to set aside state-court rulings." Uttecht v. Brown, 551 U.S. 1, 10 (2007) (citations omitted). As the Supreme Court has explained, AEDPA's requirements reflect "the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." Harrington v. Richter, 562 U.S. 86, 102–03 (2011) (quoting Jackson v. Virginia, 443 U.S. 307, 332 n.5 (1979)). Where state courts have ruled on a claim, AEDPA imposes "a substantially higher threshold" for obtaining relief than a de novo review of whether the state court's determination was incorrect. Schriro v. Landrigan, 550 U.S. 465, 473 (2007) (citing Williams, 529 U.S. at 410).

Specifically, a federal court may not grant habeas relief on a claim rejected on the merits in state court unless the state decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1) and (d)(2). A state court's legal decision is "contrary to" clearly established federal law under § 2254(d)(1) "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. at 412–13. An "unreasonable application" occurs when "the state court identifies the correct legal principle from [the Supreme] Court's

decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. A state court decision is not unreasonable under this standard simply because the federal court finds it erroneous or incorrect. Id. at 411. Rather, the federal court must determine that the state court's decision applies federal law in an objectively unreasonable manner. Id. at 410–12.

Similarly, a district court on habeas review may not find a state court factual determination to be unreasonable under § 2254(d)(2) simply because it disagrees with the determination; rather, the determination must be "'objectively unreasonable' in light of the evidence presented in the state court proceedings.'" Young v. Hofbauer, 52 F. App'x 234, 236 (6th Cir. 2002). "A state court decision involves 'an unreasonable determination of the facts in light of the evidence presented in the State court proceeding' only if it is shown that the state court's presumptively correct factual findings are rebutted by 'clear and convincing evidence' and do not have support in the record." Matthews v. Ishee, 486 F.3d 883, 889 (6th Cir. 2007) (quoting § 2254(d)(2) and (e)(1)); but see McMullan v. Booker, 761 F.3d 662, 670 and n.3 (6th Cir. 2014) (observing that the Supreme Court has not clarified the relationship between (d)(2) and (e)(1) and the panel did not read Matthews to take a clear position on a circuit split about whether clear and convincing rebutting evidence is required for a petitioner to survive (d)(2)). Moreover, under § 2254(d)(2), "it is not enough for the petitioner to show some unreasonable determination of fact; rather, the petitioner must show that the resulting state court decision was 'based on' that unreasonable determination." Rice v. White, 660 F.3d 242, 250 (6th Cir. 2011).

Thus the standard set forth in 28 U.S.C. § 2254(d) for granting relief on a claim rejected on the merits by a state court "is a 'difficult to meet' and 'highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt.'" Cullen v. Pinholster, 563 U.S. 170, 181 (2011) (quoting Harrington, 562 U.S. at 102, and

Woodford v. Visciotti, 537 U.S. 19, 24 (2002) (per curiam)). Petitioner carries the burden of proof. Pinholster, 563 U.S. at 181.

Even that demanding review, however, is ordinarily only available to state inmates who have fully exhausted their remedies in the state court system. 28 U.S.C. §§ 2254(b) and (c) provide that a federal court may not grant a writ of habeas corpus on behalf of a state prisoner unless, with certain exceptions, the prisoner has presented the same claim sought to be redressed in a federal habeas court to the state courts. Pinholster, 563 U.S. at 182. This rule has been interpreted by the Supreme Court as one of total exhaustion. Rose v. Lundy, 455 U.S. 509 (1982). Thus, each and every claim set forth in the federal habeas corpus petition must have been presented to the state appellate court. Picard v. Connor, 404 U.S. 270 (1971); see also Pillette v. Foltz, 824 F.2d 494, 496 (6th Cir. 1987) (exhaustion "generally entails fairly presenting the legal and factual substance of every claim to all levels of state court review"). Moreover, the substance of the claim must have been presented as a federal constitutional claim. Gray v. Netherland, 518 U.S. 152, 162–63 (1996).

The procedural default doctrine is ancillary to the exhaustion requirement. See Edwards v. Carpenter, 529 U.S. 446 (2000) (noting the interplay between the exhaustion rule and the procedural default doctrine). If the state court decides a claim on an independent and adequate state ground, such as a procedural rule prohibiting the state court from reaching the merits of the constitutional claim, a petitioner ordinarily is barred from seeking federal habeas review. Wainwright v. Sykes, 433 U.S. 72, 81–82 (1977); see also Walker v. Martin, 562 U.S. 307, 315 (2011) ("A federal habeas court will not review a claim rejected by a state court if the decision of the state court rests on a state law ground that is independent of the federal question and adequate to support the judgment"); Coleman v. Thompson, 501 U.S. 722 (1991) (same). If a claim has never been presented to the state courts, but a state court remedy is no longer available (e.g., when

an applicable statute of limitations bars a claim), then the claim is technically exhausted, but procedurally barred. Coleman, 501 U.S. at 731–32.

If a claim is procedurally defaulted, "federal habeas review of the claim is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in fundamental miscarriage of justice." Coleman, 501 U.S. at 750. The burden of showing cause and prejudice to excuse defaulted claims is on the habeas petitioner. Lucas v. O'Dea, 179 F.3d 412, 418 (6th Cir. 1999) (citing Coleman, 501 U.S. at 754). "'[C]ause' under the cause and prejudice test must be something external to the petitioner, something that cannot fairly be attributed to him [;] ... some objective factor external to the defense [that] impeded ... efforts to comply with the State's procedural rule." Coleman, 501 U.S. at 753 (emphasis in original). Examples of cause include the unavailability of the factual or legal basis for a claim or interference by officials that makes compliance "impracticable." Id. To establish prejudice, a petitioner must demonstrate that the constitutional error "worked to his actual and substantial disadvantage." Perkins v. LeCureux, 58 F.3d 214, 219 (6th Cir. 1995) (quoting United States v. Frady, 456 U.S. 152, 170 (1982)); see also Ambrose v. Booker, 684 F.3d 638, 649 (6th Cir. 2012) (finding that "having shown cause, petitioners must show actual prejudice to excuse their default"). "When a petitioner fails to establish cause to excuse a procedural default, a court does not need to address the issue of prejudice." Simpson v. Jones, 238 F.3d 399, 409 (6th Cir. 2000). Likewise, if a petitioner cannot establish prejudice, the question of cause is immaterial.

Because the cause and prejudice standard is not a perfect safeguard against fundamental miscarriages of justice, the United States Supreme Court has recognized a narrow exception to the cause requirement where a constitutional violation has "probably resulted" in the conviction of

one who is "actually innocent" of the substantive offense. Dretke v. Haley, 541 U.S. 386, 392

(2004) (citing Murray v. Carrier, 477 U.S. 478, 495–96 (1986)); accord Lundgren v. Mitchell, 440

F.3d 754, 764 (6th Cir. 2006).

## V.     ANALYSIS AND DISCUSSION

### A.  CLAIMS 1 and 3 – INSUFFICIENT EVIDENCE and SELF-DEFENSE

In his direct appeal, Petitioner exhausted a claim that the evidence was not sufficient to

support his conviction, particularly because it did not negate his theory of self-defense. (Doc. No.

14-13 at 7, 49–54.)  The Tennessee Court of Criminal Appeals rejected that claim on its merits:

> The defendant claims that the evidence is insufficient to support his conviction.
> "When the sufficiency of the evidence is challenged, the relevant question is
> whether, after reviewing the evidence in the light most favorable to the State, any
> rational trier of fact could have found the essential elements of the crime beyond a
> reasonable doubt." State v. Dorantes, 331 S.W.3d 370, 379 (2011); Jackson v.
> Virginia, 443 U.S. 307, 319 (1979). Moreover, "on appeal, the State must be
> afforded the strongest legitimate view of the evidence and all reasonable inferences
> that may be drawn therefrom." Dorantes, 331 S.W.3d at 379 (internal quotation
> omitted). A reviewing court "neither re-weighs the evidence nor substitutes its
> inferences for those drawn by the jury." State v. Carl J. Wagner, No. M2010-00992-
> SC-R11-CD, 2012 Tenn. LEXIS 746, at *19 (Tenn. Oct. 12, 2012). "Because a
> guilty verdict removes the presumption of innocence and replaces it with a
> presumption of guilt, on appeal a defendant bears the burden of showing why the
> evidence is insufficient to support the conviction." Id. at *18.
>
> This standard of appellate review applies to all convictions, regardless of whether
> they are based on direct or circumstantial evidence. Dorantes, 331 S.W.3d at 379-
> 81. Even when a criminal offense has been proven exclusively through
> circumstantial evidence, the weight given that evidence, the inferences to be drawn
> from that evidence, and the extent to which all the circumstances are consistent with
> guilt are jury questions; under no circumstances may an appellate court "substitute
> its inferences for those drawn by the trier of fact," regardless of whether direct
> evidence exists or the State's case is wholly circumstantial. Id. at 379.
>
> In the case before us, the defendant was convicted of first degree (premeditated)
> murder. "First degree murder is . . . [a] premeditated and intentional killing of
> another." T.C.A. § 39-13-202(a)(1) (2008). "Premeditation" means that the
> defendant formed the intent to kill: (1) "prior to the act itself" (although the
> defendant need not necessarily have held that intent "for any definite period of
> time" prior to the act), (2) "after the exercise of reflection and judgment," while (3)
> "sufficiently free from excitement and passion." T.C.A. § 39-13-202(d).
> "Premeditation may be established by any evidence from which a rational trier of

fact may infer that the killing was done 'after the exercise of reflection and judgment'. . . ." State v. Leach, 148 S.W.3d 42, 53 (Tenn. 2004) (quoting T.C.A. § 39-13-202(d)). A defendant's (1) "threats or declarations of intent to kill," (2) "preparations to conceal the crime undertaken before the crime is committed," (3) "use of a deadly weapon upon an unarmed victim," and/or (4) "destruction or secretion of evidence of the killing," are just some of the many factors from which a reasonable jury may infer premeditation. Id. at 53-54.

'Self-defense" is a defense against prosecution for murder. Tennessee Code Annotated section 39-11-601(b)(1) provides that:

> [A] person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force against another person when and to the degree the person reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful force.

T.C.A. § 39-11-611(b)(1). Deadly force may even be used in self-defense if certain conditions are met, such as "[t]he person has a reasonable belief that there is an imminent danger of death or serious bodily injury." See T.C.A. § 39-11-611(b)(2). If a defendant raises facts sufficient to support a finding of self-defense, "[t]he [S]tate has the burden of proving beyond a reasonable doubt that the defendant did not act in self-defense." State v. Belser, 945 S.W.2d 776, 782 (Tenn. Crim. App. 1996). Whether or not a defendant acted in self-defense is a question of fact for the jury. State v. Clifton, 880 S.W.2d 737, 743 (Tenn. Crim. App. 1994).

After reviewing the entire record with these standards in mind, we conclude that the evidence adduced by the State was sufficient to support the defendant's conviction for premeditated first degree murder. Although the defendant testified that the victim's initial wounds on the morning in question were self-inflicted, he acknowledged on the stand that he shot the victim several times at the conclusion of their second struggle. Moreover, it was the jury's prerogative as to whether to believe the defendant's testimony that the initial wounds were self-inflicted. Additionally, the medical examiner opined that one of the latter gunshot wounds standing alone would certainly have been fatal to the victim. This testimony combined is sufficient to establish that the defendant intentionally killed the victim.

There was also sufficient evidence adduced at trial to support the jury's conclusion that the defendant killed the victim in a premeditated fashion. The defendant himself testified that he contemplated killing the victim on several occasions, including at various points throughout the day on June 5, 2008. Although the defendant further testified that he had abandoned this homicidal intent by the morning of the shooting, the jury was free to discredit this portion of his testimony.

In addition, the State presented sufficient evidence to establish several factors from which the jury could reasonably infer premeditation. Ms. Scott, Mr. Harris, and Ms. Alexander each testified that the defendant had made prior declarations of his intention to kill the victim. The defendant himself testified that he used a deadly weapon against an unarmed victim and that he concealed or destroyed evidence,

including a bloody shirt and the murder weapon, following the shooting. There was also evidence presented at trial from which a reasonable jury could have concluded that the defendant had made prior preparations to conceal his role in the killing. The defendant testified that he drove his mother's car—rather than his own—to the scene of the shooting and that he parked it some distance away from the victim's residence. Ms. Snowdon testified that she did not hear a car fleeing the scene following the shooting. From this, a jury could reasonably conclude that the defendant intentionally took a strange vehicle to the area, and parked it in a remote location, for purposes of increasing the likelihood of a successful getaway following the shooting. Evidence concerning each of these four factors is relevant to the issue of premeditation. The existence of evidence sufficient to support a finding that all four of these factors were satisfied, especially when combined with the defendant's own admission on the stand that he had prior homicidal thoughts concerning the victim on numerous occasions, fully suffices to support the jury's conclusion that the defendant was guilty of premeditated first degree murder.

The defendant also asserts that the State never produced evidence sufficient to defeat his claim of self-defense. In this regard, the defendant urges that all of the evidence presented by the State was consistent with his claim that the victim was shot during the course of a mutual struggle for possession of his firearm. The defendant places particular emphasis on the testimony of Ms. Snowdon to the effect that she heard two voices arguing loudly before the shots were fired. The defendant also directs our attention to the testimony of Detective Corcoran (describing evidence that a struggle occurred in the parking lot of the victim's complex) and to the combined testimony of Dr. Deering and Mr. Dunlop (to the effect that the defendant bit the victim on the arm while the victim was still alive).

However, the defendant's version of events was not entirely consistent with the evidence presented at trial. For example, the defendant's testimony conflicts with Dr. Deering's testimony that some of the shots that the victim received came from behind. It is also inconsistent with the testimony of various police officers to the effect that the blood trail that they discovered on the morning in question meandered back and forth (as likely would be created by a wounded individual fleeing from someone with a gun) rather than remaining roughly straight (as likely would be created by a wounded individual who now possessed a gun and was pursuing his former attacker). The defendant also claimed that the victim, after gaining possession of the gun, spoke to him numerous times in a threatening manner—a sequence of events that would appear extremely improbable in light Dr. Deering's testimony that the victim had been shot and severely wounded in the jaw—a wound which, in his professional opinion, occurred in the parking lot and well prior to the fatal shot (which was inflicted behind the victim's apartment building). The defendant also testified that his gun was a semi-automatic (a type which ejects a shell casings after each shot) and that he fled the scene immediately after the last shot was fired without so much as a backward glance at the victim— yet multiple law enforcement witnesses testified that no shell casings were found at the crime scene. These and other discrepancies between the defendant's testimony and the remaining evidence would fully support and explain the jury's decision to reject the defendant's claim of self-defense.

More importantly, even had the defendant's version of events been entirely consistent with the remaining evidence, a reasonable jury would still have been free to discredit his testimony. A reasonable jury could have concluded on these facts that the seeming consistency between the defendant's testimony and the remaining evidence was the natural result of a decision by the defendant to tailor his testimony to account for all of the evidence that he had just heard and seen during the State's case-in-chief. Discrediting the defendant's testimony and crediting the testimony of the witnesses for the State, a reasonable jury could certainly have concluded that the defendant's act of shooting an unarmed man four times in the head and neck (sometimes from behind)—in multiple locations and from multiple distances, over a period of several minutes—was not a lawful exercise of the right to self-defense that the law afforded him.

In the alternative, the defendant argues that the State failed to prove that he did not act in the heat of passion and upon adequate provocation when he committed the offense, thus reducing the severity of his crime from first degree murder to manslaughter. "Voluntary manslaughter is the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." T.C.A. § 39-13-211.

There is evidence in the record that would have supported the defendant's conviction of this lesser offense. However, the defendant's jury did not do so. It was for the jury to decide whether the defendant acted under adequate provocation, and the jury was under no obligation to accept the defendant's contention that the killing was committed in a state of passion. State v. Johnson, 909 S.W.2d 461, 464 (Tenn. Crim. App. 1995) (presence of extreme passion and adequate provocation are jury questions). This court will not revisit the jury's decision in this regard. As we have discussed, there is ample evidence in the record from which a jury could conclude that the defendant killed the victim in a premeditated fashion. This same evidence generally supports the jury's conclusion that this defendant was no longer acting under the influence of extreme passion when he killed the victim. The defendant's claim that the evidence is insufficient to support his conviction for premeditated first degree murder is denied.

(Doc. No. 14-15 at 22–26.) Respondent asserts that this ruling is not contrary to and does not unreasonably apply federal law. (Doc. No. 15 at 36.)

The right to due process guaranteed by the Constitution ensures that no person will suffer a criminal conviction without sufficient proof. The evidence is sufficient if "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis in original). The state court accurately identified this standard, and analyzed

the evidence presented at trial in light of it. It also correctly applied the rule that a reviewing court must "draw all available inferences and resolve all issues of credibility in favor of the jury's verdict." United States v. Conatser, 514 F.3d 508, 518–19 (6th Cir. 2008) (quoting United States v. Salgado, 250 F.3d 438, 446 (6th Cir. 2001)).

Habeas review adds yet another layer of deference to the sufficiency analysis. In reviewing such an analysis by a state court in a federal habeas action, "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was 'objectively unreasonable.'" Cavazos v. Smith, 132 S. Ct. 2, 4 (2011). Witness credibility assessments are "predominately the business of trial courts," and "federal habeas courts do not have license, under § 2254(d), to redetermine witness credibility, whose demeanor is observed exclusively by the state court." Givens v. Yukins, 238 F.3d 420 (6th Cir. 2000) (citing Marshall v. Lonberger, 459 U.S. 422, 434 (1983)).

Petitioner devotes most of his argument in support of these claims to listing pieces of evidence in the record that he says support the theory that his altercation with the victim began with a fight rather than an "execution-style attack," and that he acted in self-defense.[2] (Doc. No. 1 at 34–40, 48–62.) Some of those examples on which he relies are simply incorrect or illogical.

---

[2] Petitioner's argument of these claims includes a lengthy discussion of other witnesses who could have could have been called at trial to corroborate his testimony that he was regularly driving his mother's car around the time of the shooting, and that he often drove other people's vehicles because he was a shade-tree mechanic. (Doc. No. 1 at 36–37.) But "the sufficiency of the evidence review authorized by Jackson is limited to 'record evidence.' Jackson does not extend to nonrecord evidence." Herrera v. Collins, 506 U.S. 390, 402 (1993) (citation omitted). Moreover, regardless of what other reasons Petitioner had for having his mother's car that morning, he admitted at trial that he drove her car and purposely parked in another area of the victim's apartment complex to avoid being seen. (Doc. No. 14-7 at 106–07.) Accordingly, Petitioner's proposed additional evidence would not have made the state court's finding of sufficient evidence of premeditation unreasonable.

For example, Petitioner argues that it "makes no sense at all" that the victim would have run away from possible sources of help and toward the back of the apartment complex "if he were being pursued by an armed attacker." (Id. at 35.)  But it makes as much sense as Petitioner's testimony that *he* ran away from those sources of help when the victim was aiming a gun at *him*. (See Doc. No. 14-7 at 115–16; Doc. No. 14-15 at 20.)

Additionally, Petitioner's assertion that the prosecutor conceded that the victim was the aggressor and that he had proven self-defense (see Doc. No. 1 at 39) is contradicted by the record. After Petitioner's testimony, the prosecutor wanted to introduce into evidence a recording of a telephone call from the victim to the police a few weeks before the murder, in which the victim conveyed that he was concerned about a threat to his safety from Petitioner. (Doc. No. 14-7 at 229–36.)  In a jury-out argument concerning the admissibility of the recording, the judge asked what evidence the recording would rebut, and the prosecutor responded: "That [the victim] is the first aggressor.  That [the victim] walked across the parking lot to [Petitioner]." (Id. at 232.)  The judge and prosecutor went on to have this exchange:

> THE COURT:  So where are we?
>
> GENERAL SOBRERO: We are at the fact that the defendant has raised self-defense.
>
> THE COURT: Okay.
>
> GENERAL SOBRERO: Legally [the victim] is the first aggressor.
>
> THE COURT: So because I've said before that I'm concerned about something and aware of this threat that means that I couldn't be the first aggressor?
>
> GENERAL SOBRERO:  It certainly places some question into whether or not that's right.

(Id. at 233–34.)  It is clear in context that the prosecution's statement that the victim was the first aggressor was simply her recitation of Petitioner's theory that she wanted to rebut with evidence that raised "some question" about its veracity.  Petitioner's effort to characterize the prosecutor's statement as an admission is unavailing.

But more importantly, the heart of Petitioner's argument is that the jury just got it wrong by not believing him, and that the state court was wrong not to overturn the jury's decision. Petitioner's jury clearly determined that his testimony was not credible, despite there being some evidence consistent with a struggle in the parking lot. The state court's deference to the jury's determination, which was supported by the evidence referenced above by the Tennessee Court of Criminal Appeals, was not unreasonable. Particularly in light of the "double layer of deference" this Court must extend on this claim—first to the jury's finding of guilt and then to the state appellate court's finding of sufficient evidence, White v. Steele, 602 F.3d 707, 710 (6th Cir. 2009)—Petitioner is not entitled to relief on this claim.

B. CLAIM 2 – JENCKS VIOLATION

Petitioner alleges that the prosecution violated Jencks v. United States, 353 U.S. 657 (1957), by failing to turn over a recorded statement Scott gave to the police before trial, and that the state court erred by failing to grant a mistrial on that basis. (Doc. No. 1 at 9, 45.) The petition indicates that Petitioner exhausted this claim on direct appeal. (Id. at 9–10.) But Respondent asserts that Petitioner failed to raise this claim in state court and that it is procedurally defaulted. (Doc. No. 15 at 51–52.)

Contrary to Petitioner's allegation, he did not raise this claim in his brief on direct appeal, and the Tennessee Court of Criminal Appeals did not consider it. (Doc. Nos. 14-13, 14-15.) Petitioner has not established any cause for the default of this claim, and it is accordingly not subject to consideration in this case.

C. CLAIM 4 – INFERENCE OF GUILT

Petitioner claims that the trial court violated his right to a fair trial by instructing the jury that it could infer Petitioner's guilt from the concealment or destruction of evidence. (Doc. No. 1

at 12, 62–63.)  He raised a claim on direct appeal that the trial court had erred by giving that

instruction, and the Tennessee Court of Criminal Appeals rejected it:

> The defendant claims that the trial court erred by granting the State's request for a special jury instruction. "It is well-settled that a defendant has a constitutional right to a complete and correct charge of the law, so that each issue of fact raised by the evidence will be submitted to the jury on proper instructions." Dorantes, 331 S.W.3d at 390. A "trial judge has the duty to give a complete charge of the law applicable to the facts of the case." State v. Davenport, 973 S.W.2d 283, 287 (Tenn. Crim. App. 1998); see also State v. Thompson, 519 S.W.2d 789, 792 (Tenn. 1975). "The proper function of a special instruction is to supply an omission or correct a mistake made in the general charge, to present a material question not treated in the general charge, or to limit, extend, eliminate, or more accurately define a proposition already submitted to the jury." State v. Cozart, 54 S.W.3d 242, 245 (Tenn. 2001). "In determining whether instructions are erroneous, th[e] Court must review the charge in its entirety and read it as a whole." Leach, 148 S.W.3d at 58. "The misstatement of an element in jury instructions is subject to constitutional harmless error analysis." State v. Faulkner, 154 S.W.3d 48 (Tenn. 2005). "A charge should be considered prejudicially erroneous if it fails to fairly submit the legal issues or if it misleads the jury as to the applicable law." State v. Vann, 976 S.W.2d 93, 101 (Tenn. 1998).

The charge in question stated in its entirety:

> Any attempt by an accused to conceal or destroy evidence is relevant as a circumstance from which guilt of the accused may be inferred. The Court has charged the jury concerning an inference that the jury may make in regard to certain evidence in this case. However, the jury is not required to make this inference. It is the exclusive province of the jury to determine whether the facts and circumstances shown by all the evidence in this case warrant the inference which the law permits the jury to draw. The inference may be rebutted by direct or circumstantial evidence or both, whether it exists in the evidence of the State or is offered by the defendant. The State must prove beyond a reasonable doubt every element of the offense before the defendant can be found guilty.

The defendant claims that this instruction "failed to adequately clarify that the inference of guilt extended to all of the lesser-included offenses and was not associated solely with the indicted offense." The defendant asserts that this deficiency is significant because the Tennessee Supreme Court has cautioned that the post-crime concealment of evidence is not proof of premeditation, citing *State v. West*, 844 S.W.2d 144, 148 (Tenn. 1992). The defendant explains that "given the confusion that may arise from the fact that concealment can generally indicate guilt, but cannot establish the element of premeditation, the defendant contends that when the inference instruction is provided in a first degree murder prosecution, special consideration should be made to ensure that the instruction does not mislead the

jury as to the applicable law."

However, we note that the <u>West</u> court itself, immediately after holding that a defendant's post-crime concealment of a weapon provided insufficient evidence of premeditation, upheld the trial court's use of a jury instruction broader than the one at issue in this case. The instruction at issue in <u>West</u> stated simply that "any attempt to suppress, destroy, or conceal evidence is relevant as a circumstance from which guilt of an accused so acting, may be inferred." <u>West</u>, 844 S.W.2d at 150. If the giving of such an instruction concerning the concealment or destruction of evidence was potentially unconstitutionally confusing in light of the court's holding with respect to premeditation in first degree murder cases, we believe that the <u>West</u> court would have commented on this fact. Instead, the <u>West</u> court explained:

> Although we have previously stated in this opinion that the concealment of evidence is not an indication of premeditation or deliberation, it is equally clear that the concealment of evidence may be relevant to guilt. For example, in this case the concealment of evidence contradicts defendant's self-defense story by illustrating his fear of detection. Thus, this instruction was properly given.

<u>Id.</u> at 150.

In any event, we do not believe that the trial court's instructions, read as a whole, were likely to confuse the jury. The trial court's special instruction was carefully worded, reminding the jury that it was not required to infer guilt from the acts at issue and that notwithstanding the inference the burden of proof remained on the prosecution with respect to every element of the crime charged. The trial court also properly instructed the jury that the defendant was presumed innocent and that it was the prosecution's duty to prove his guilt beyond a reasonable doubt. The trial court gave the jury clear instructions concerning the issue of premeditation. Taken together, we believe that the instructions at issue fairly submitted the legal issues and informed the jury of the applicable law. The defendant's claim that the trial court erred by granting the State's request for a special instruction concerning the concealment or destruction of evidence is denied.

(Doc. No. 14-15 at 31–33.)

Respondent observes that Petitioner cited only state law in marshaling this claim in state court, and asserts that any related federal claim is procedurally defaulted. (Doc. No. 15 at 52.) But Petitioner's argument in support of the claim in his state brief relied on his "constitutional right to a correct and complete charge of the law" and his "constitutional right to trial by jury." (Doc. No. 14-13 at 46.) Because it is more straightforward to turn directly to the merits of Petitioner's claim than to sift through his state court brief to determine whether he preserved his federal claim, the

Court considers this claim regardless of its alleged default. See 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."); see also Hudson v. Jones, 351 F.3d 212, 216 (6th Cir. 2003) (proceeding directly to merits analysis because "the question of procedural default presents a complicated question . . . and is unnecessary to our disposition of the case"); Forensic v. Birkett, 451 F. Supp. 2d 874, 887 (E.D. Mich. 2006) (performing de novo review of unexhausted habeas claim because "it is easier to address the merits of Petitioner's claim than to perform a procedural default analysis").

An erroneous jury instruction cannot be the basis for habeas corpus relief unless it "so infected the entire trial that the resulting conviction violates due process." Estelle v. McGuire, 502 U.S. 62, 72 (1991) (quoting Cupp v. Naughten, 414 U.S. 141, 147 (1973)). To prevail on a claim of faulty jury instruction, a habeas petitioner must "establish[] not merely that the instruction is undesirable, erroneous, or even 'universally condemned', but that it violated some [constitutional] right." Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974).

Petitioner has not cited any federal law holding that a negative inference jury instruction about a criminal defendant's destruction of evidence violates the United States Constitution. The United States Court of Appeals for the Sixth Circuit has held that a defendant's destruction of evidence is probative evidence of guilt. United States v. Kuehne, 547 F.3d 667, 692 (6th Cir. 2008). Accordingly, instructing the jury that it can make such an inference is "not unfair or unduly prejudicial," and does not warrant federal habeas relief. White v. Knipp, No. 2:11-CV-3016 TLN DAD, 2013 WL 5375611, at *33 (E.D. Cal. Sept. 24, 2013). Petitioner, therefore, has not established that the instruction in question was even erroneous, much less that it so infected the entire trial that it calls the verdict into question. He is not entitled to relief on this claim regardless

of whether it is defaulted.

E. CLAIM 5 – INEFFECTIVE ASSISTANCE OF COUNSEL AT TRIAL

Petitioner alleges that his trial counsel was ineffective for failing to: (1) have ballistics testing performed on the bullet recovered from the victim's neck; (2) object to the prosecution's closing argument; (3) raise a Confrontation Clause objection to the admission of a recording of a phone call made by the victim; (4) object or file motions in limine to exclude irrelevant computer information; and (5) object to witness testimony. (Doc. No. 1 at 64.) Respondent agrees that these claims were exhausted in state court. (Doc. No. 15 at 39.)

1. Standard of Review for Ineffective Assistance Claims

All federal claims of ineffective assistance of counsel are subject to the highly deferential two-prong standard of Strickland v. Washington, 466 U.S. 668 (1984), which asks: (1) whether counsel was deficient in representing the defendant; and (2) whether counsel's alleged deficiency prejudiced the defense so as to deprive the defendant of a fair trial. Id. at 687. To meet the first prong, a petitioner must establish that his attorney's representation "fell below an objective standard of reasonableness," and must overcome the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that . . . the challenged action 'might be considered sound trial strategy.'" Id. at 688, 689. The "prejudice" component of the claim "focuses on the question of whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." Lockhart v. Fretwell, 506 U.S. 364, 372 (1993). Prejudice, under Strickland, requires showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the

outcome." Id.

The Supreme Court has further explained the Strickland prejudice requirement as follows:

In assessing prejudice under Strickland, the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently. Instead, Strickland asks whether it is "reasonably likely" the result would have been different. This does not require a showing that counsel's actions "more likely than not altered the outcome," but the difference between Strickland's prejudice standard and a more-probable-than-not standard is slight and matters "only in the rarest case." The likelihood of a different result must be substantial, not just conceivable.

Harrington v. Richter, 562 U.S. 86, 111–12 (2011) (internal citations omitted). "[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." Strickland, 466 U.S. at 697.

As discussed above, however, a federal court may not grant habeas relief on a claim that has been rejected on the merits by a state court, unless the petitioner shows that the state court's decision "was contrary to" law clearly established by the United States Supreme Court, or that it "involved an unreasonable application of" such law, or that it "was based on an unreasonable determination of the facts" in light of the record before the state court. 28 U.S.C. § 2254(d)(1) and (2); Williams v. Taylor, 529 U.S. 362, 412 (2000). Thus, when an exhausted claim of ineffective assistance of counsel is raised in a federal habeas petition, the question to be resolved is not whether the petitioner's counsel was ineffective. Rather, "[t]he pivotal question is whether the state court's application of the Strickland standard was unreasonable." Harrington v. Richter, 562 U.S. at 101. As the Supreme Court clarified in Harrington,

This is different from asking whether defense counsel's performance fell below Strickland's standard. Were that the inquiry, the analysis would be no different than

if, for example, this Court were adjudicating a <u>Strickland</u> claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), an unreasonable application of federal law is different from an incorrect application of federal law. A state court must be granted a deference and latitude that are not in operation when the case involves review under the <u>Strickland</u> standard itself.

<u>Id.</u> (internal quotation marks and citation omitted).

The Tennessee Court of Criminal Appeals accurately identified and explained the <u>Strickland</u> standard for federal ineffective-assistance claims:

The right to effective assistance of counsel is safeguarded by the Constitutions of both the United States and the State of Tennessee. U.S. Const. amend. VI; Tenn. Const. art. I, § 9. In order to receive post-conviction relief for ineffective assistance of counsel, a petitioner must prove two factors: (1) that counsel's performance was deficient; and (2) that the deficiency prejudiced the defense. <u>Strickland v. Washington</u>, 466 U.S. 668, 687 (1984); <u>see</u> <u>State v. Taylor</u>, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (stating that the same standard for ineffective assistance of counsel applies in both federal and Tennessee cases). Both factors must be proven in order for the court to grant post- conviction relief. <u>Strickland</u>, 466 U.S. at 687; <u>Henley</u>, 960 S.W.2d at 580; <u>Goad v. State</u>, 938 S.W.2d 363, 370 (Tenn. 1996). Additionally, review of counsel's performance "requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." <u>Strickland</u>, 466 U.S. at 689; <u>see also</u> <u>Henley</u>, 960 S.W.2d at 579. We will not second-guess a reasonable trial strategy, and we will not grant relief based on a sound, yet ultimately unsuccessful, tactical decision. <u>Granderson v. State</u>, 197 S.W.3d 782, 790 (Tenn. Crim. App. 2006).

As to the first prong of the Strickland analysis, "counsel's performance is effective if the advice given or the services rendered are within the range of competence demanded of attorneys in criminal cases." <u>Henley</u>, 960 S.W.2d at 579 (citing <u>Baxter v. Rose</u>, 523 S.W.2d 930, 936 (Tenn. 1975)); <u>see also</u> <u>Goad</u>, 938 S.W.2d at 369. In order to prove that counsel was deficient, the petitioner must demonstrate "that counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." <u>Goad</u>, 938 S.W.2d at 369 (citing <u>Strickland</u>, 466 U.S. at 688); <u>see also</u> <u>Baxter</u>, 523 S.W.2d at 936.

Even if counsel's performance is deficient, the deficiency must have resulted in prejudice to the defense. <u>Goad</u>, 938 S.W.2d at 370. Therefore, under the second prong of the <u>Strickland</u> analysis, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." <u>Id.</u> (quoting <u>Strickland</u>, 466 U.S. at 694) (internal quotation marks omitted).

(Doc. No. 14-25 at 32.)

The Court's review of Petitioner's Claim 5 thus turns on whether the state court unreasonably applied this standard in ruling on the ineffective-assistance claims before it. As Respondent correctly points out (see Doc. No. 15 at 40 n.1), that review is limited to the evidence that was presented in state court. Cullen v. Pinholster, 563 U.S. 170, 181 (2011) (holding that where a claim has been adjudicated on the merits in state court and a petitioner seeks relief under 28 U.S.C. § 2254(d)(1), federal court review "is limited to the record that was before the state court that adjudicated the claim on the merits"). Accordingly, the Court does not consider Petitioner's new evidence in connection with Claim 5.

2.      Claim 5.1 – Ballistics Testing

Petitioner alleges that counsel was ineffective for failing to develop and present ballistics evidence that would have confirmed that the bullet in the victim's neck was fired from Petitioner's .25 caliber pistol, rather than a revolver that the prosecution suggested Petitioner might have recently bought for the purpose of killing the victim. (Doc. No. 1 at 64–65.) The state court rejected that claim:

> The Petitioner asserts that trial counsel and co-counsel were deficient in failing to perform an investigation into the type and caliber of the bullet recovered from the victim's autopsy. He contends that the results of the testing would have corroborated the Petitioner's recollection of events, thus bolstering the Petitioner's credibility at trial, and prevented the State from offering "a significant portion of its premeditation and deliberation evidence."
>
> The State responds that the decision not to conduct ballistics testing of the bullet was a strategic decision, pointing to trial counsel's testimony that such evidence "would bolster, not refute the State's argument for the lack of shell casings at the scene." The State reasons that, had the proof from the ballistics testing been presented to the jury, its argument regarding the lack of shell casings at the crime scene—that the Petitioner picked up the casings—would have been strengthened.[3]

---

[3] The state court's opinion does not explicitly explain the connection between the type of gun and the presence or absence of shell casings, but the Court takes notice of the common knowledge that revolvers do not typically eject shell casings as they are fired.

Finally, the State notes that the ballistics testing "does not refute or mitigate the State's other evidence of premeditation."

Regarding this issue, trial counsel testified that he was concerned that ballistics testing would confirm that the murder weapon was the Petitioner's, and he believed a better strategy was to distance the Petitioner from the murder weapon. Trial counsel also testified that conclusive proof that the Petitioner used a .25 caliber semi-automatic would have bolstered the State's argument that the Petitioner picked up the shell casings. Arguably, counsel should have tested the bullet recovered from the victim's autopsy in order to corroborate the Petitioner's claim that the gun used in the offense was his .25 caliber semi-automatic Bryco and not, as suggested by the State, a newly-purchased revolver. However, it is not entirely clear from the record whether, prior to trial, counsel was aware of or contemplated that the State would argue that the Petitioner used a revolver. In any event, we agree with the State that the Petitioner has failed to establish prejudice in light of the overwhelming evidence of the Petitioner's premeditation, including: (1) the Petitioner made prior declarations to several people of his intent to kill the victim; (2) the Petitioner used a deadly weapon against an unarmed victim; (3) the Petitioner shot the victim multiple times in the head and neck; (4) the Petitioner did not call police or seek help for the victim after the shooting; (5) the Petitioner destroyed evidence of the crime following the murder by tossing the gun over a bridge, getting rid of his bloody shirt, and deleting an internet search on his computer for directions to the victim's home; (6) the Petitioner searching the internet for ways to kill someone; and (7) the Petitioner made prior preparations to conceal his role in the killing by driving his mother's car—rather than his own—to the scene of the shooting and parking it some distance away from the victim's residence. In addition to the overwhelming evidence of premeditation that existed, we note that, although the conclusions of the firearms report would seemingly refute the State's argument that the Petitioner shot the victim with a revolver, they do not refute the reasonable inference argued by the State that the Petitioner picked up the shell casings before fleeing the scene. Because no reasonable probability exists that presenting the proof from the ballistics testing would refute or alter the significant evidence of premeditation and undermine the outcome of this case, the Petitioner has failed to show prejudice and he is not entitled to relief.

(Doc. No. 14-25 at 32–33.) Respondent asserts that this analysis was not unreasonable. (Doc. No. 15 at 42.)

Petitioner argues first that the state court erred in crediting counsel's testimony that he made a strategic decision not to confirm that the gun used in the shooting was his, because that strategy would be senseless when the defense theory involved admitting that the gun used was the one Petitioner always carried. (Doc. No. 1 at 65–66.) And second, Petitioner argues that he was prejudiced by counsel's failure for two reasons: (1) proof that the gun used was the same one

Petitioner always carried would have defeated the prosecution's theory that the crime was premeditated because Petitioner had recently shopped for a gun; and (2) showing the jury the small size of the shell casings ejected by pistols like Petitioner's would have provided an alternative reason for investigators' failure to find casings at the scene, other than the prosecution's suggestion that Petitioner picked them up. (Id.)

The Court agrees with Petitioner that counsel's explanation for why he did not pursue ballistics testing was illogical in light of the defense utilized at trial. But that explanation was not the basis for the state court's ruling on this claim. As quoted above, the Tennessee Court of Criminal Appeals found that counsel "arguably" failed to perform as he should have in this instance. Nevertheless, it concluded that Petitioner was not prejudiced by that failure in light of all of the other evidence of premeditation that supported the jury verdict. Petitioner, who had acknowledged weeks earlier that he had homicidal thoughts about the victim, drove in the early morning in a car that would not be recognized to a location where it would not be seen, carrying a weapon that caused the victim's death, then left the victim dead or dying on the ground without calling for help, drove away and disposed of the weapon and his bloody clothing, and deleted an internet search for directions to the victim's home. The state court's determination that there was no reasonable probability that the ballistics report would have changed the outcome of the case in those circumstances was not unreasonable.

3.      Claim 5.2 – Objection to Closing Argument

Petitioner claims that trial counsel was ineffective for failing to object to the prosecutor's argument about facts that were not in evidence, including Petitioner's interest in a revolver, the possibility that he had used a bag to capture shell casings or had picked them up, the possibility that he used construction drop cloths or similar supplies to keep from leaving evidence in his

mother's car, that Petitioner chased the victim as he was running away, and that "it was possible to know what occurred that day." (Doc. No. 1 at 67–72.) The Tennessee Court of Criminal Appeals rejected each of those theories:

The Petitioner contends that counsel rendered deficient performance when counsel failed to object to portions of the State's closing argument, wherein the prosecutor made statements "that were not based on any evidence entered into proof throughout the duration of the trial." Specifically, the Petitioner asserts that counsel should have objected when the prosecutor stated in closing argument that the Petitioner: (1) "looked around for revolvers"; (2) used a bag to catch expelled shell casings; (3) picked up shell casings from the crime scene; (4) brought along extra "construction supplies" as part of his premeditation; (5) chased down the victim; and (6) that it was "possible to know what occurred that day." The Petitioner contends that counsel's alleged deficiency render the jury's verdict unreliable. The State responds that the prosecutor's arguments were, "at a minimum, reasonable inferences based on the evidence" and that the Petitioner cannot show that the failure to object to the complained of passages resulted in prejudice to the defense.

After a thorough review of the record on appeal, as well as the record from the Petitioner's direct appeal, we conclude that the arguments cited by the Petitioner were based upon evidence admitted at trial or reasonable inferences therefrom. As to the prosecutor's claim that the Petitioner "looked around for revolvers," the State offered evidence at trial that the Petitioner browsed several pages of a website called "Gunsofamerica" dealing with Taurus pistol revolvers. Additionally, the Petitioner admitted that he was "searching for guns" and "different ways to purchase guns" leading up to the victim's murder. Regarding the prosecutor's suggestion that the Petitioner used a bag to catch the expelled shell casings or picked up the shell casings after the shooting, these arguments were based upon the lack of shell casings at the crime scene. At trial, the Petitioner testified that he shot the victim with a semi-automatic handgun, but officers testified that they found no shell casings at the crime scene. The prosecutor's comments were thus based on the evidence and reasonable inferences that could be drawn from the evidence. As to the prosecutor's suggestion that the Petitioner may have brought along extra "construction supplies" as part of the Petitioner's premeditation, this comment appears to be based upon the Petitioner's earlier testimony about the "construction equipment" in his car when he went to the victim's apartment (and sat in the parking lot planning to kill the victim) on June 4. The Petitioner testified that he had with him "knives or sharp objects," a change of clothes, "plastic drop cloths," water, soap, a mask, and several pairs of gloves. The Petitioner also admitted that a number of those items were part of the plan to kill the victim that morning. Although the Petitioner's testimony related to items he had with him on June 4, we conclude that the prosecutor's comments were based on proof entered into evidence at trial. Likewise, the prosecutor's argument that the Petitioner chased down the victim was based upon the evidence. Dr. Deering testified that some of the shots that the victim received came from behind, and various police officers testified that the blood trail

that they discovered on the morning in question meandered back and forth—as likely would be created by a wounded individual fleeing from someone with a gun.

Finally, the Petitioner contends that counsel should have objected to the State's assertion that it was possible to know what had occurred on the day of the shooting. In support of his claim, the Petitioner cites to the following statement made by the prosecutor in closing argument:

> Premeditation. The calmness and the coolness. One of two things had to have happened that early morning. And we don't know which it is and we never will know this beyond a reasonable doubt.

While not entirely clear from the Petitioner's brief, we interpret his claim to be that the prosecutor's statement contradicts the State's subsequent assertion that it had proven its case beyond a reasonable doubt. However, having reviewed the entirety of the State's closing argument, we believe that the prosecutor made the above-quoted statement in reference to the State's inability to establish conclusively whether a revolver or semi-automatic was used in the offense. We agree with the post-conviction court's determination that the State never conceded in closing argument that there was reasonable doubt as to the Petitioner's premeditation. The Petitioner has failed to establish deficient performance on the part of counsel in failing to object to these alleged instances of prosecutorial misconduct and is not entitled to relief.

(Doc. No. 14-25 at 34–35.) Respondent asserts that this ruling was not unreasonable. (Doc. No. 15 at 44.)

Petitioner says there was no evidence that he ever actually typed "revolver" into a web browser, but acknowledges that a detective testified that there was evidence that someone using his user name on a laptop he shared had visited pages of a gunsofamerica.com website about Taurus revolvers. (Doc. No. 1 at 68.) The state court reasonably determined that evidence of visiting specific pages about revolvers from a website was sufficient to support the prosecution's argument that Petitioner had looked around for revolvers.

Petitioner argues that there was no evidence to support the argument that he used a bag to collect shell casings or that he picked up the casings from the ground, because investigators never even looked for shell casings on the ground. (Doc. No. 1 at 69–70.) In support of this argument, Petitioner discusses the testimony of law enforcement officers who were on the scene, including providing apparent quotations, but he does not cite the portions of the transcript in the record where

those quotations or general testimony can be found. (<u>See</u> Doc. No. 1 at 69–70.) Respondent's response is equally unhelpful, because it does not address Petitioner's specific argument about this sub-claim or cite to anything outside the appellate state court opinion itself. (<u>See</u> Doc. No. 15 at 44.)

Nevertheless, the Court has reviewed the trial testimony of Officers Matthews (Doc. No. 14-3 at 192–212), Lawrence (<u>id.</u> at 136–78), Spencer (<u>id.</u> at 3–14), and Corcoran (Doc. No. 14-4 at 2–56), and it does not support Petitioner's argument. Matthews testified that he was in the identification section of the police department, whose function it was to "process, document and collect physical evidence at crime scenes," and that he and Officer Lawrence processed this crime scene. (Doc. No. 14-3 at 192–93.) He testified on cross-examination that he did not recover any bullets or other physical evidence from the scene. (<u>Id.</u> at 206, 212.) Contrary to Petitioner's assertion, Matthews never testified at trial that "he 'did not look for shell casings.'" (<u>See</u> Doc. No. 1 at 69.) Lawrence, who was also part of the identification section, testified that he arrived at the crime scene and "started investigating trying to find more information out what had occurred." (Doc. No. 14-3 at 138.) He testified that he did not remember if any bullet was found, but that Matthews would have collected it if it was found. (<u>Id.</u> at 171.) Corcoran, who was the lead homicide detective on the case, testified that no weapons or shell casings were found on the scene, and that the identification section officers were "in charge of locating" any shell casings. (Doc. No. 14-4 at 6, 45.) He explained that "[o]nce the identification sections [sic] gets there, they will take over to try to identify, locate and document any evidence like that." (<u>Id.</u> at 45.) The prosecutor could certainly have elicited clearer testimony from Matthews and Lawrence about looking for shell casings as part of their investigating and processing the crime scene. But Corcoran's description of the identification section's role as including "locat[ing] any evidence like that," is

an adequate basis from which to infer that they did, in fact, look for shell casings. Accordingly, it was not unreasonable for the state court to conclude that the prosecutor's theories during closing arguments about why no shell casings were found at the scene were based on reasonable inferences from the evidence.

Petitioner next complains that counsel should have objected to the prosecutor's theory during closing argument that he had used drop cloths or other supplies to avoid leaving evidence in his mother's car. He testified at trial that the day he sat in the victim's apartment parking lot thinking about killing him, his plan included supplies that he had in his Jeep, including a tool bag, plastic drop cloths, and gloves. (Doc. No. 14-7 at 168–70.) He believes the prosecutor's theory that he might have used those supplies the day of the shooting was unfounded, because there was no direct evidence that he moved those supplies from his Jeep to his mother's car. (Doc. No. 1 at 70.) But the state court concluded that the prosecutor's theory was a fair inference from the evidence, and that conclusion was not so unreasonable that it is beyond fair-minded disagreement.

Petitioner also claims that counsel should have objected to the prosecutor's comments during closing argument about his chasing the victim as the victim was running away. But, as the state court found, both the blood trail evidence and the gunshot evidence supported that theory.

And finally, Petitioner claims that his counsel should have objected to the very suggestion that "it was possible to know what occurred that day," in light of the prosecution's statement that some part of the case would never be known beyond a reasonable doubt. (Doc. No. 1 at 71.) The prosecutor's statement in context was:

> One of two things had to have happened that early morning. And we don't know which it is and we never will know beyond a reasonable doubt. But we don't have to know this beyond a reasonable doubt.
>
> He had a semiautomatic. We know he looked around for revolvers. According to him he had a semiautomatic. . . . Well, what's the advantage to revolvers? Revolvers don't kick out shells. Revolvers don't leave behind evidence.

So on this early morning hour, which was it?

(Doc. No. 14-8 at 20.)  In that context, it is apparent that the prosecutor was acknowledging that it had not been proven beyond a reasonable doubt which type of gun Petitioner had used in the shooting, not that Petitioner's guilt had not been proven beyond a reasonable doubt.  The state court's conclusion to that effect was not unreasonable.

The state court's conclusion that each of the prosecutor's remarks in question were not improper, and therefore that counsel did not perform deficiently by not objecting to them, was not unreasonable.

4.      Claim 5.3 – Objection to Recording of Phone Call

On direct appeal, Petitioner exhausted a claim that the trial court erred by admitting, over counsel's objection, an excerpt of a recording of a phone call the victim made to police days before his death about being concerned about Petitioner.  The Tennessee Court of Criminal Appeals rejected that claim on several different theories asserted by Petitioner, but found that he had waived any objection based on the Confrontation Clause:

> Although the defendant objected to the admission of the redacted recording on hearsay grounds and on grounds that it constituted improper rebuttal, the defendant did not raise any Confrontation Clause concerns during a fairly lengthy jury-out hearing on the subject. Neither the parties nor the trial court appear to have considered the constitutional ramifications of admitting the recording. Consequently, we find that the defendant waived his Confrontation Clause claim by virtue of his failure to take any and all reasonable steps to prevent or mitigate any possible constitutional error stemming from the recording's admission. See Tenn. R. App. P. 36(b) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error.").  See also Tenn. R. Evidence 103(a) ("Error may not be predicated upon a ruling which admits or excludes evidence unless ... a timely objection ... appears of record ... stating the specific ground of objection if the specific ground was not apparent from the context ....").
>
> Notwithstanding the defendant's failure to bring this issue to the trial court's attention, this court has the authority to review the defendant's claim under the "plain error" standard. See State v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000) ("Rule of Appellate Procedure 36(b), Rule of Evidence 103(d), and Rule of Criminal

Procedure 52(b) allow this Court to take notice of 'plain errors' that were not raised in the proceedings below."). This court will only grant relief under the "plain error" standard if the claim involves an error that probably changed the outcome of the trial, and five additional factors are satisfied: "(a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is necessary to do substantial justice." Id. (internal quotations omitted).

After listening to the recording at issue and reviewing the entire record, we conclude that the trial court's decision to admit the excerpt of the victim's phone call to police did not have any significant impact on the outcome of the trial. Playing the recording took up less than ten seconds of a four-day trial. The excerpt itself was not particularly emotional or memorable. Nor was it dispositive of any of the major issues presented in the case. While the victim's recorded statement that he was "a little more concerned" about the defendant's activities in the weeks prior to the trial reflected a mindset that was somewhat inconsistent with the defendant's claim that the victim initiated the later confrontation, it does not appear likely to have been the decisive factor on which the jury based its decision in light of the voluminous evidence presented by the prosecution in its case-in-chief.

In addition, we are not convinced that several of the other factors necessary for relief under the plain error standard are present. No clear and unequivocal rule of law has been breached. Deciding whether or not the tape at issue constitutes testimonial evidence requires this court to consider factors such as "whether contact was initiated by the declarant or law enforcement officers," "whether the statement was given in response to questioning," "the declarant's purpose in making the statements," and "whether an objective declarant under the circumstances would believe that the statements would be used at trial." Maclin, 183 S.W.3d at 349. Because the defendant did not raise the Confrontation Clause issue at trial, the record before us provides no insight whatsoever with respect to any of these issues. The excerpt may well have been properly admitted as non-testimonial evidence. The admission of audio recordings of many 911 calls have been upheld against Confrontation Clauses challenges on such grounds, including one admitted by the United States Supreme Court in Davis. Nor on this record is it entirely clear to us consideration of any possible error is necessary to do substantial justice.

Because the defendant failed to object to the admission of the excerpt of the victim's phone call to police on Confrontation Clause grounds, no clear rule of law was breached, and the admission of the excerpt did not probably change the outcome of the trial, the defendant is entitled to no relief on this issue. The defendant's claim that the trial court erred by admitting a portion of a telephone call made by the victim to the police is denied.

(Doc. No. 14-15 at 28–9.)

In his subsequent post-conviction proceeding, Petitioner raised the claim that counsel had

been ineffective for failing to object to the recording on Confrontation Clause grounds. The state court also rejected that claim:

> Next, the Petitioner contends that counsel was ineffective in failing to assert the Confrontation Clause as a basis for the inadmissibility of a recording of a phone call from the victim, in which the victim stated he was "concerned" about threats made by the Petitioner. The Petitioner argues that counsel's failure to object on this basis allowed the jury to hear the victim's voice "from the grave."

In denying relief on this claim, the post-conviction court stated:

> The [P]etitioner's post-hearing brief also alleges that trial counsel was ineffective in failing to object to the admission of the phone call played at trial wherein the victim stated that he was "concerned" on the basis of the Confrontation Clause. The Court held a jury out proffer at the point of the State's rebuttal evidence and only let in a small portion of the victim's phone call. The excerpt was only one statement and less than ten seconds long in its entirety. It would qualify as the declarant's state of mind and would not be excluded under Crawford v. Washington, 541 U.S. 36 (2004). Even if the [P]etitioner raised the objection, it would be admissible as the statement was non-testimonial in nature as no prosecution was contemplated at the time the statement was made. The Court of Criminal Appeals reviewed this issue under a plain error standard and found no error. The Court of Criminal Appeals also noted that playing the recording took up less than ten seconds of a four-day trial and was not particularly emotional, memorable, or dispositive of any major issue in the case. The Court of Criminal Appeals also said that the recording "does not appear likely to have been the decisive factor on which the jury based its decision in light of the voluminous evidence by the prosecution in its case-in-chief." The Petitioner has failed to prove this allegation by clear and convincing evidence and has not demonstrated the requisite prejudice.

Upon review, we agree with the post-conviction court that the Petitioner has failed to establish deficient performance and prejudice. On direct appeal, this court found no plain error based upon the claim that the recording was testimonial evidence and admitted in violation of the Confrontation Clause because "the record before us provides no insight whatsoever with respect to any of these issues." Brian Le Hurst, 2012 WL 6673119, at *25. The same holds true for the Petitioner's claim of ineffective assistance of counsel because the Petitioner appears to be relying on the same record. As noted by the State, "[a]part from the fact that the victim appears to have placed the call on or about June 5, 2008, and that he spoke to a police officer, the record reveals nothing else." Neither trial counsel nor co-counsel was questioned about the circumstances surrounding the call and the creation of the recording at the post-conviction hearing. Furthermore, the record does not provide any context for the victim's statement such as whether it was in response to

questioning, the degree of formality, with whom the victim spoke, the scope of any questioning, the victim's purpose in making the statement or the officer's purpose in speaking with the victim. Because the Petitioner has failed to establish that the statements were inadmissible under the Confrontation Clause, we cannot conclude that trial counsel was deficient in failing to object on this basis. Moreover, the Petitioner cannot prove that the outcome of his case would have been different without the recording in light of this court's conclusion on direct appeal that the recording failed to "have any significant impact on the outcome of the trial." Id. As noted by this court previously, the recording is short and "not particularly emotional or memorable." Id. The Petitioner is not entitled to relief.

(Doc. No. 14-25 at 35–6.) Respondent asserts that this determination was not unreasonable under the standard required by AEDPA. (Doc. No. 15 at 46.)

Petitioner disagrees with the state court's determination, and argues that playing the recording clearly violated the Confrontation Clause, that counsel's performance in failing to raise the Confrontation Clause was deficient, and that the recording's admission prejudiced the outcome of his case. (Doc. No. 1 at 75–7.) But he does not cite or discuss any Supreme Court precedent that makes the state court's determination *unreasonable*. It was undisputed at trial that Petitioner had thought about killing the victim, that the victim was aware of the threat Petitioner posed to his safety, and that an altercation between Petitioner and the victim—in the early morning outside the victim's apartment, where Petitioner had arrived in an unrecognizable car, which he had hidden from sight—led to the victim's death from multiple gunshot wounds. Under those circumstances, it was not unreasonable for the state courts to conclude that the brief recording of the victim's expressing his "concern" about Petitioner did not have any likely impact on the outcome of the case.

5.    Claim 5.4 – Objection to Computer Evidence

Petitioner alleges that trial counsel was ineffective for failing to object to or move to prevent the admission of several facts discovered through the forensic analysis of his computer. The Tennessee Court of Criminal Appeals affirmed the denial of relief on that claim:

The Petitioner next asserts that counsel was ineffective for failing to object to or file motions to exclude irrelevant computer-related information that the Petitioner argues were admitted with the intent to make the Petitioner appear to be a "dangerous" and "controlling individual." Specifically, the Petitioner references a search for the movie "The Hitman," biblical verses about love, and keystroke software installed on the Petitioner's computer in 2007. The Petitioner contends that the proof was irrelevant because the State failed to establish a connection between this information and the victim's murder.

Regarding this issue, the post-conviction court stated:

> The [P]etitioner alleges that trial counsel was ineffective for failing to object to inadmissible testimony by Detective Gish that related to the [P]etitioner's computer and internet search activities. The [P]etitioner testified at trial and acknowledged computer internet searching items that were extremely relevant to the [P]etitioner in this case. The Court finds that there was no error in admitting the evidence the [P]etitioner claims were inadmissible. Nor does the Court find that trial counsel was deficient in this regard. The [P]etitioner has failed to prove this allegation by clear and convincing evidence and has not demonstrated the requite prejudice.

The State asserts that the evidence does not preponderate against the post-conviction court's findings that the Petitioner failed to establish deficient performance or prejudice. We agree with the State.

It is clear from the testimony at the post-conviction hearing that trial counsel did not believe the "collateral background evidence" from the forensic search, such as "The Hitman" movie and biblical verses about love, would be persuasive to the jury. Likewise, trial counsel testified that he did not believe the jury would care about the key logger program that had been installed on the Petitioner's computer and that he decided not to pursue issues that he thought would be unimportant to the jury. Instead, counsel focused on the most troubling information obtained from the forensic search, including that the Petitioner "had Map-Quested directions to the [the victim's] house on June 22nd, drove to [the victim's] house on the 23rd, shot and killed him and came back and deleted it off of his computer." This court will not second-guess a reasonable trial strategy. See Granderson, 197 S.W.3d at 790. Moreover, the State presented other, compelling evidence from the search of the Petitioner's computer which was relevant in establishing the Petitioner's intent and premeditation in killing the victim. Thus, the Petitioner has not shown there is a reasonable probability that the result of the proceeding would have been different had the challenged evidence been excluded. He is not entitled to relief on this basis.

(Doc. No. 14-25 at 37–8.)  Respondent argues that the state court's determination was not unreasonable under AEDPA. (Doc. No. 15 at 48.)

Once again, Petitioner disagrees with the state court's conclusion, but does not cite or

discuss any Supreme Court precedent showing that it was unreasonable. (Doc. No. 1 at 77–80.)

Trial counsel testified at the post-conviction hearing that the Hitman movie search and the key

logger were "collateral" facts that he did not believe the jury would "give a second thought." (Doc.

No. 14-19 at 82–3.)  He said that as "a trial strategy decision," he believed it best to handle facts

like that in a way to prevent drawing more attention to them. (Id. at 84.)  Counsel testified that the

jury would not be as persuaded by those facts "as much as [Petitioner's] Map-questing directions

to the guy's house, going there the next day, shooting and killing him, and coming back and

deleting it from his computer." (Id. at 83.)  Particularly in light of Petitioner's admission that he

had been "consumed with anger and rage and jealousy" (Doc. No. 14-15 at 17), and had been

thinking about killing the victim, counsel's assessment of the relatively negligible harm posed by

an old key logger, a Hitman movie search, and a few Bible verses was not so objectively deficient

that it constituted ineffective assistance.   And for that same reason, there is no reasonable

likelihood that counsel's decision not to object to the admission of those facts had any impact on

the outcome of Petitioner's trial.   Accordingly, the state court's determination of this sub-claim

was not unreasonable.

   6.  Claim 5.5 – Objection to Witness Testimony

  Petitioner alleges that Carter Wamp and Julia Neilan testified falsely about their

interactions with Petitioner, and that he had never spoken in person with either of them.  He claims

that counsel was ineffective for failing to object to their testimony. (Doc. No. 1 at 80–82.)  The

Tennessee Court of Criminal Appeals rejected that claim:

> The Petitioner also asserts that he was denied the effective assistance of counsel
> when counsel failed to object to the testimony of Ms. Neilan-Keaton and Mr. Wamp
> on the basis of hearsay. He contends that, although he had never met Ms. Neilan-
> Keaton or Mr. Wamp, "[b]oth witnesses provided testimony at trial as though they
> were the individual that engaged in the activity they testified about." The Petitioner
> argues that, as a result of counsel's failure to object to the testimony of Ms. Neilan-

Keaton and Mr. Wamp, he was "denied his opportunity to confront each witness pursuant to the Sixth Amendment."

In denying relief, the post-conviction court accredited the testimony of counsel that they had no reason to believe that Ms. Neilan-Keaton had not evaluated the Petitioner. Regarding Mr. Wamp, the post-conviction court concluded that the Petitioner had not shown that Mr. Wamp's testimony was inaccurate and false, nor shown any resulting prejudice.

The evidence does not preponderate against the post-conviction court's findings. At the post-conviction hearing, trial counsel testified that, had he become aware during trial that Ms. Neilan-Keaton was lying about her interaction with the Petitioner, trial counsel would have done something about it. Likewise, co-counsel stated that, if he had thought Ms. Neilan-Keaton was testifying based on hearsay, he would have objected. Although the Petitioner stated that he learned after trial that the property manager he spoke to was Mr. Gully and not Mr. Wamp, the Petitioner did not call Mr. Gully as a witness at the post-conviction hearing, and we will not speculate as to what Mr. Gully's testimony would have been. See Black v. State, 794 S.W.2d 752, 757-58 (Tenn. Crim. App. 1990). Additionally, the Petitioner was not denied the opportunity to confront Ms. Neilan-Keaton and Mr. Wamp as counsel cross-examined both witnesses at trial. We conclude that the Petitioner has failed to establish deficient performance on the part of counsel or resulting prejudice. This issue is without merit.

(Doc. No. 14-25 at 38.)

Essentially, Petitioner's claim is that these two witnesses committed perjury when they testified about personal interactions with him, and that trial counsel was ineffective for not somehow stopping them from doing so. But his own testimony about the witnesses' dishonesty is contradicted by the witnesses' clear testimony at trial and Ms. Neilan-Keaton's testimony at the post-conviction hearing. Specifically, Neilan-Keaton confirmed under oath at the hearing that she "physically saw [Petitioner] in the same room" when she assessed him, and that, even though she did not recognize him, her assessment was based on actually seeing him and not from someone else's notes or reports. (Doc. No. 14-19 at 6–7.)

Moreover, only Petitioner's own testimony supports his claim that his counsel had any reason to know that the witnesses were lying. One of Petitioner's trial attorneys testified that if he had been aware at trial that Ms. Neilan-Keaton was lying, he would have done something about it,

but that he did not have any basis for challenging her credibility: "I would have to the best of my ability. But I, again, don't know what I would cross examine against her as to the motive, or her prejudice against Mr. Hurst that would compel her to lie or present untruthful testimony." (Id. at 78.) Petitioner's other trial attorney, who actually handled Ms. Neilan-Keaton's cross-examination, testified that he moved to exclude her testimony on other grounds, but had no memory of Petitioner's telling him that he had never met with Ms. Neilan-Keaton. (Id. at 128.) Neither attorney was questioned at the post-conviction hearing about whether they had any knowledge of Petitioner's claim that Mr. Wamp was not the property manager who asked him to leave the victim's parking lot.

Faced with a credibility determination between Petitioner's testimony and all other evidence in the record pertaining to the testimony of Ms. Neilan-Keaton and Mr. Wamp, it was not unreasonable for the state court to conclude that Petitioner had not proven that he was entitled to relief on this sub-claim.

## F. CLAIM 6 – PROSECUTORIAL MISCONDUCT

Petitioner alleges that the prosecutor committed misconduct at trial by making the same allegedly unfounded arguments during closing to which he claimed counsel was ineffective for failing to object in Claim 5.2. (Doc. No. 1 at 91.) He raised this claim in post-conviction proceedings, and the state courts rejected it:

> The Petitioner also raises a standalone claim of prosecutorial misconduct based upon multiple statements by the prosecutor during closing argument that the Petitioner asserts were not supported by the evidence. The State responds that the Petitioner waived this issue by failing to raise it on direct appeal. We agree with the State.
>
> A ground for post-conviction relief is waived "if the petitioner personally or through an attorney failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented[.]" Tenn. Code Ann. § 40-30-106(g) (2014); see, e.g., Jeffery Boyd Trusty v. State, No. M2012-01128-CCA-R3-PC, 2013 WL 5883813, at * 16 (Tenn. Crim. App.

> Oct. 31, 2013), <u>perm. app. denied</u> (Tenn. Mar. 11, 2014). Because the Petitioner
> could have raised the issue of prosecutorial misconduct on direct appeal and failed
> to do so, we conclude that this issue is waived.

(Doc. No. 14-25 at 38–9.)  The state court thus rejected this claim on an adequate and independent

ground of state procedural law, and Respondent correctly asserts that it is procedurally defaulted.

(Doc. No. 15 at 51, 54.)  <u>See</u> <u>Hutchison v. Bell</u>, 303 F.3d 720, 738 (6th Cir. 2002) ("Tennessee's

waiver rule, T.C.A. § 40–30–206(g) [now 40-30-106(g)], which provides that claims not raised in

a prior proceeding are barred, constitutes an adequate and independent state-law rule precluding

habeas relief.").

Petitioner claims that the failure to raise this claim at the appropriate time was due to

ineffective assistance of counsel, and that the claim should therefore be heard. (Doc. No. 1 at 91.)

The Court construes Petitioner's argument to assert that he can overcome the default of his claim

pursuant to <u>Martinez v. Ryan</u>, 566 U.S. 1 (2012), in which the Supreme Court held that, in certain

circumstances, "[i]nadequate assistance of counsel at initial-review collateral proceedings may

establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial." <u>Id.</u>

at 9.  But <u>Martinez</u> is limited to claims of ineffective assistance of counsel at trial and does not

apply to prosecutorial misconduct claims. <u>Abdur'Rahman v. Carpenter</u>, 805 F.3d 710, 714 (6th

Cir. 2015).  Moreover, the Tennessee Court of Criminal Appeals found that this claim was waived

on direct appeal, and the Supreme Court has expressly ruled that <u>Martinez</u> does not apply to claims

of ineffective assistance of appellate counsel. <u>Davila v. Davis</u>, 137 S. Ct. 2058 (2017).

Finally, even if <u>Martinez</u> could apply to this claim, it would still fail. To overcome default

under <u>Martinez</u>, a petitioner must show that post-conviction counsel was ineffective during the

"initial-review collateral proceeding," <u>Martinez</u>, 566 U.S. at 16, and that the underlying claim is a

"substantial one, which is to say that the prisoner must demonstrate that the claim has some merit."

<u>Id.</u> at 14.  For the same reasons discussed above in connection with Claim 5.2, Petitioner's claims

of prosecutorial misconduct are not sufficiently substantial to merit further review under <u>Martinez</u>.

### G. CLAIM 7 – INEFFECTIVE ASSISTANCE OF COUNSEL AT POST-CONVICTION

Petitioner alleges that his post-conviction counsel was ineffective in various ways during post-conviction initial review and post-conviction appeal. (Doc. No. 1 at 101.) Ineffective assistance of counsel during post-conviction proceedings does not raise a cognizable independent habeas claim, because there is no constitutional right to effective counsel at post-conviction. <u>Coleman v. Thompson</u>, 501 U.S. 722, 752 (1991) ("There is no constitutional right to an attorney in state post-conviction proceedings. Consequently, a petitioner cannot claim constitutionally ineffective assistance of counsel in such proceedings.") (citations omitted). Claim 7, therefore, does not state a viable claim for habeas relief.

## VII. CONCLUSION

Petitioner's claims are all either defaulted or fail on their merits for the reasons set forth above. Accordingly, the Court will deny the requested relief and dismiss the petition.

An appropriate Order will enter.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE